UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHRISTOPHER JAMISON,

                              Plaintiff,                              5:09-CV-0620
                                                                     (GTS/ATB)
v.

DAVID METZ; BRIAN DAVIS;
TIM MacDERMONT; and KEVIN WALSH,

                              Defendants.
_____

APPEARANCES:                                          OF COUNSEL:

CHRISTOPHER JAMISON, 07-B-1724
  Plaintiff, *Pro Se*
Elmira Correctional Facility
P.O. Box 500
Elmira, New York 14902

CITY OF SYRACUSE LAW DEPT.                            JAMES P. McGINTY, ESQ.
  Counsel for Defendants Metz, Davis,
  and MacDermont
233 East Washington Street
300 City Hall
Syracuse, New York 13202

ONONDAGA COUNTY DEPT. OF LAW                          CAROL L. RHINEHART, ESQ.
  Counsel for Defendant Walsh
421 Montgomery Street, 10th Floor
Syracuse, New York 13202

HON. GLENN T. SUDDABY, United States District Judge

### MEMORANDUM-DECISION and ORDER

        Currently before the Court, in this *pro se* civil rights action filed by Christopher Jamison

("Plaintiff") against David Metz, Brian Davis, Tim MacDermont, and Kevin Walsh, are the

following: (1) a motion for summary judgment filed by David Metz, Brian Davis, and Tim

MacDermont ("City Defendants") (Dkt. No. 36); and (2) a motion for summary judgment filed by Kevin Walsh ("County Defendant") (Dkt. No. 39).  For the reasons set forth below, City Defendants' motion is granted; County Defendant's motion is granted; and Plaintiff's Complaint is dismissed in its entirety with prejudice.

## I.     RELEVANT BACKGROUND

### A.     Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges as follows: (1) on February 12, 2007, Plaintiff "went to American Rental Agency . . . in North Syracuse[, where he] completed a purchase agreement for a black Lincoln Aviator"; (2) "while [Plaintiff] was test driving the vehicle on I-81, a Syracuse police officer . . . heard a description from a 911 dispatcher . . . that Plaintiff took the vehicle at gunpoint"; (3) "[t]he officer began to chase Plaintiff south on I-81"; (4) "Plaintiff pulled of[f] the highway on the Brighton Avenue exit"; (5) "[t]wo police officers tried to use their cars to box him in"; (6) "Plaintiff swerved out of control and briefly stopped the car"; (7) "[t]he officers fired shots into the rear tires"; (8) "Plaintiff exited the vehicle and ran"; (9) "in an act of surrendering, [Plaintiff] stopped at the corner . . . and put his hands up in the air"; (10) "[w]ithout warning, [D]efendants Metz, Davis, and MacDermont shot . . . [P]laintiff, hitting him with multiple bullets from behind"; (11) Plaintiff was subsequently "taken into custody . . ., placed in an ambulance, and delivered to the care of [D]efendant Walsh at the Justice Center"; (12) "[f]or three weeks [P]laintiff sat in the custody of [D]efendant Walsh at the Justice Center with his gun shot wounds"; (13) "[o]n May 1, 2007, [P]laintiff was taken to the University Hospital"; (14) "Plaintiff was in great pain[,] . . . his fingers on his left hand was stiff and did not move properly[, and he] suffered significant bone

2

fragmentation and scarred tissue"; and (15) Defendant Walsh, who "is responsible for the

custody, supervisi[on] and training of his staff[,] . . . was directly responsible for [P]laintiff's

medical needs[,]" and acted with deliberate indifference to those needs.  (*See generally* Dkt. No.

1 [Plf.'s Compl.].)

Based on these (and other) factual allegations, Plaintiff's Complaint, when liberally

construed, asserts the following claims: (1) a claim of excessive force under the Fourth

Amendment against City Defendants; (2) claims of assault and battery under New York State

law against City Defendants; and (3) a claim of deliberate indifference to his serious medical

needs under the Eighth Amendment against County Defendant.  (*Id*.)

Familiarity with the remaining factual allegations supporting these claims in Plaintiff's

Complaint is assumed in this Decision and Order, which is intended primarily for review by the

parties.  (*Id*.)

**B.   Undisputed Material Facts**

The following is a general summary of material facts that are undisputed by the parties.

(*Compare* Dkt. No. 38 [City Defs.' Rule 7.1 Statement] *and* Dkt. No. 39, Attach. 1 [County

Def.'s Rule 7.1 Statement] *with* Dkt. No. 49 [Plf.'s Rule 7.1 Response].)[1]

---

[1]     The Court notes that the portion of Plaintiff's Rule 7.1 Response that responds to the undisputed material facts asserted by City Defendants improperly responds to the "statement of facts" provided by City Defendants in a declaration from their attorney.  (*Compare* Dkt. No. 36, Attach. 1 *with* Dkt. No. 49.)  However, City Defendants' "Statement of Material Facts Not In Dispute" is set forth in a separate document.  (Dkt. No. 38.)  Out of an extension of special solicitude to Plaintiff as a *pro se* civil rights litigant, the Court has deemed Plaintiff's denials that were properly supported by record evidence as denying those facts asserted by City Defendants as undisputed in their "Statement of Material Facts Not In Dispute."  Having said that, the Court finds that Plaintiff received adequate notice of the consequences of failing to comply with Local Rule 7.1.  (*See, e.g.*, Dkt. No. 39; Dkt. No. 43.)  *See also* Local Rules of Practice for the Northern District of New York (provided to correctional facility in which Plaintiff was

On February 12, 2007, Plaintiff went to the American Auto Sales ("American") at 5400 South Bay Road in North Syracuse.  Plaintiff drove away from American in a black Lincoln Aviator.  While driving the Lincoln, Plaintiff was chased by another vehicle driven by the owner of American, Kristopher Tucci.

Plaintiff drove the Lincoln onto Route 81, where he was subsequently chased by a Syracuse Police vehicle driven by Officer David Metz.  Before seeing the Lincoln, Officer Metz had heard over his police radio that an armed robbery had occurred at American on South Bay Road and, specifically, that the suspect had stolen a Lincoln SUV at gunpoint.

During the pursuit, Plaintiff abruptly stopped at a stoplight.  Officer Metz stopped behind Plaintiff's vehicle and Officer MacDerment pulled his vehicle to a stop in front of Plaintiff's vehicle.

At approximately 3:20 p.m., while working in Unit 651, police officer Brian Davis heard a point-of-information broadcast from the dispatcher regarding an armed robbery that happened in North Syracuse.  While in pursuit of the stolen vehicle, Officer Davis heard over his police radio that Plaintiff had rammed into a police vehicle at the corner of Calthrop Avenue and South Salina Street.  Upon arriving at the 100 block of Calthrop Avenue, Officer Davis attempted to stop the Lincoln by disabling the rear tires using his gun.  Shortly thereafter, Plaintiff exited his

---

incarcerated at time he was served with Defendants' motions).  As a result, wherever Plaintiff has failed to cite record evidence in support of his denials of properly supported facts provided by either City Defendants or County Defendant, the Court has deemed such facts admitted to the extent they are not clearly in dispute.  *See, e.g., Staley v. Mika*, 08-CV-0305, 2010 WL 3907824, at *1 (N.D.N.Y. Sept. 29, 2010) (Suddaby, J.) (accepting as true "only the properly supported facts contained in [d]efendant's Local Rule 7.1 Statement, which are not clearly in dispute[,]" that plaintiff failed to admit or deny); *see also*, *infra*, Part II of this Decision and Order (reciting, *inter alia*, consequences of non-movant's failure to properly respond to a motion for summary judgment).

vehicle carrying a firearm, which he fired at Officer Davis.  Plaintiff then ran away from the officers, who continued to pursue him.  During the pursuit, more shots were fired, and Plaintiff was struck by several bullets fired from the weapon of one or more City Defendant.

Plaintiff was eventually taken into custody and transported by ambulance to University Hospital, where he was treated for multiple gunshot wounds.  Plaintiff was admitted overnight and treated for a superficial abrasion on the posterior right scapula, a bullet entry wound in the right lateral leg, and a fifth digit pylon comminuted fracture.  Plaintiff's wounds were cleaned, and his left arm and hand were splinted.  Plaintiff was also evaluated by psychiatry and placed on psychiatric medications.

The next day, on February 13, 2007, Plaintiff was discharged from University Hospital with instructions to keep his left arm and hand in the splint that was provided to him for two weeks, after which point he was to follow up with the hand clinic and trauma clinic.  Upon discharge from the hospital, Plaintiff was booked at the Onondaga County Justice Center.  At the time of booking, Plaintiff was seen by a nurse and his medical history was obtained.  The nurse took Plaintiff's vitals, with the exception of his blood pressure, which was not obtained due to a dressing on one arm and a splint on the other.

In addition to the initial nursing assessment, Plaintiff was seen by mental health staff for a mental health assessment.  Due to Plaintiff's psychiatric and medical status, he was taken to "5A medical housing" at the Justice Center and placed on constant observation status.  He was also given Tylenol and Motrin for pain.

On February 14, 2007, Plaintiff was examined by Dr. James Greenwald at the Justice Center.  Plaintiff's vitals were taken and his shoulder and leg wounds were examined and

cleaned.  Dr. Greenwald noted that Plaintiff was doing well and could move all fingers on his left hand despite the splint not being removed.  Dr. Greenwald wrote orders directing that Plaintiff be scheduled for a follow up appointment at the orthopedic hand clinic in two weeks.  While Plaintiff was awaiting his follow up appointments at the hand clinic and trauma clinic, his wounds were cleaned and dressed, and he received pain medication.

On February 28, 2007, Plaintiff was seen at University Hospital Orthopedic Hand Clinic.  Surgery on Plaintiff's left small finger was scheduled for the following day.

On March 1, 2007, Plaintiff was taken to University Hospital Orthopedic Hand Clinic where Dr. Mosher performed an open reduction, internal fixation and application of external fixator to Plaintiff's left small finger proximal phalanx.  Plaintiff was placed in a splint, which he was directed to keep clean and dry until his follow up appointment one week later.

Upon his return to the Justice Center, Plaintiff requested a sling for his arm, which he was given on March 2, 2007.  The physician assistant directed the nursing staff to ensure that there was no vascular compromise resulting from the use of the sling.

On March 8, 2007, before being taken to University Hospital for a follow up appointment, Plaintiff was seen briefly by Dr. Yambo at the Justice Center.  At Plaintiff's follow up appointment, his wounds were examined and cleaned.  Plaintiff was instructed to return to the hand clinic for his left hand injury, and to return to the trauma clinic in two weeks for further evaluation of his back and leg wounds.

On March 14, 2007, Plaintiff was examined by Dr. Klena at University Hospital Orthopedic Hand Clinic.  Plaintiff complained of experiencing some intermittent pain when he removed the hand splint in order to shower.  He also complained of some pain when attempting

to extend and flex his small finger.  Dr. Klena removed the sutures in Plaintiff's hand and explained that he was not entirely optimistic about how much range of motion Plaintiff would develop, and that additional surgery may be required to maximize flexibility.  Plaintiff was scheduled for a follow-up appointment.  After his appointment, Plaintiff returned to the Justice Center, where he continued to receive wound care and medication to address his medical and physical needs.

On March 18, 2007, Plaintiff complained to nursing staff that he inadvertently jarred the external fixator to his hand, causing him extreme pain, swelling and some bleeding.  The nurse examined his hand, noted that the bleeding had stopped, and scheduled Plaintiff for a "priority 1" sick call visit with the physician the following day.

On March 19, 2007, Dr. Greenwald examined Plaintiff, and directed that a follow up appointment at the hand clinic be scheduled for one week later.

On March 22, 2007, Plaintiff was seen and evaluated at the University Hospital Trauma Clinic.  Staff noted that the wound to Plaintiff's right leg had completely healed, and the wound to his back was almost healed, with just a small open sore remaining.  It was recommended that Plaintiff follow up with the orthopedic hand clinic for his finger injury, and that he be evaluated by psychiatry; however, no further follow up appointment at the trauma clinic was necessary.

On March 28, 2007, Plaintiff was seen again at the University Hospital Orthopedic Hand Clinic for a follow up appointment with Dr. Weiss.  Plaintiff was fitted by Occupational Therapy with a volar forearm-based splint and his fourth and fifth digits were buddy taped.  A follow up appointment was scheduled for April 18, 2007.

After Plaintiff's appointment at the hand clinic, Dr. Greenwald referred him for physical therapy.  On April 10, 2007, Plaintiff was evaluated by a physical therapist.  Plaintiff attended physical therapy again on April 17, 2007.

On April 18, 2007, Plaintiff attended his follow up appointment at the hand clinic.  Staff noted that Plaintiff was doing "o.k.," and recommended that he continue to buddy tape his right and little finger.  It was also noted that Plaintiff would probably require more surgery.  A follow up appointment was scheduled for May 9, 2007.

On April 24, 2007, and May 8, 2007, Plaintiff attended more physical therapy.  On May 9, 2007, Dr. Mosher examined Plaintiff's finger at the hand clinic, and decided that he would schedule Plaintiff for tenolysis and arthrolysis.

On May 23, 2007, Plaintiff attended a preoperative appointment at University Hospital, where pre-testing was performed.  Plaintiff was scheduled to undergo surgery on May 31, 2007.  However, Plaintiff had already been sentenced, and was expected to be transferred from the Onondaga County Justice Center to Elmira Correctional Facility.  As a result, the hand clinic cancelled Plaintiff's scheduled surgery, and directed Justice Center officials to send Plaintiff's pre-operative packet with him to Elmira.  Plaintiff pled guilty to three counts of attempted aggravated murder.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statements and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties.  (*Id*.)

**C.      Defendants' Motions**

**1.      City Defendants' Motion**

Generally, in support of their motion for summary judgment, City Defendants argue as follows: (1) to the extent Plaintiff's excessive force claim is brought under the Eighth Amendment, it should be dismissed because Plaintiff was not incarcerated at the time of the incident giving rise to his excessive force claim; (2) to the extent Plaintiff's excessive force claim is brought under the Fourth Amendment, it should be dismissed against (a) Defendant MacDerment because, based on the undisputed material facts, he never fired his gun, and (b) Defendants Metz and Davis because, based on the undisputed material facts, it was reasonable for them to use deadly force against Plaintiff; (3) in the alternative, Plaintiff's Fourth Amendment should be dismissed on grounds of qualified immunity; and (4) Plaintiff's state law claims of assault and battery should be dismissed against (a) Defendant MacDerment because, based on the undisputed material facts, he never fired his gun, and (b) Defendants Metz and Davis because, based on the undisputed material facts, Plaintiff was the aggressor, and they were therefore justified in their use of deadly force.  (*See generally* Dkt. No. 36, Attach. 16 [City Defs.' Memo. of Law].)

In Plaintiff's response to City Defendants' motion for summary judgment, he apparently argues that it was not reasonable for City Defendants to shoot him because witnesses told police that he "had his hands up when he was shot in the back."[2]  (*See generally* Dkt. No. 49 [Plf.'s Response Memo. of Law].)

---

[2]      Although Plaintiff does not address his claims against City Defendants in his response memorandum of law, he raises this argument in a document attached to his response, which is labeled "Plaintiff's Answer to Paragraph 42 on the issue of trying to kill/shoot def[endant]."  (Dkt. No. 49, at 16.)

In their reply, City Defendants argue, *inter alia*, that (1) the admissible record evidence adduced by Plaintiff does not permit a rational factfinder to conclude that he was not in possession of a gun during the incident giving rise to his claims, and (2) rather, based on the undisputed material facts, he was in possession of a gun, which he fired at law enforcement officials, before his arrest. (*See generally* Dkt. No. 50 [City Defs.' Reply Memo. of Law].)

### 2.     County Defendant's Motion

Generally, in support of his motion for summary judgment, County Defendant argues as follows: (1) Plaintiff's claim against him should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he was personally involved in the alleged violation of Plaintiff's constitutional rights; (2) in the alternative, Plaintiff's claim against him should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that the alleged violation of Plaintiff's constitutional rights resulted from a custom or policy; and (3) in the alternative, Plaintiff's claim against him should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that any of the Justice Center staff under the supervision of County Defendant were deliberately indifferent to Plaintiff's serious medical needs. (*See generally* Dkt. No. 39, Attach. 10 [County Def.'s Memo. of Law].)

In Plaintiff's response to County Defendant's motion for summary judgment, he argues that his claims against County Defendant should not be dismissed because he has adduced admissible record evidence from which a rational factfinder could conclude that County Defendant failed to train, and/or negligently supervised, Justice Center staff, who acted with deliberate indifference to Plaintiff's serious medical needs. (*See generally* Dkt. No. 49 [Plf.'s Response Memo. of Law].)

## II.  LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c),(e).  However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial.  Fed. R. Civ. P. 56(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party."  *Anderson*, 477 U.S. at 248.  As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]; *see also* Fed. R. Civ. P. 56(e)(2).  As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted].  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id*. [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that nonmoving party is proceeding *pro se*.[3]  (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[4]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[5]  For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement[6]–even where the nonmoving party was proceeding *pro se* in a civil rights case.[7]

## III.   ANALYSIS

### A.   Plaintiff's Excessive Force Claim Against City Defendants

As stated above in Part I.C. of this Decision and Order, City Defendants seek the dismissal of this claim because (1) Plaintiff was not incarcerated at the time of the incident giving rise to his excessive force claim, and therefore the claim cannot be asserted under the

---

[3]   *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[4]   *Cusamano*, 604 F. Supp.2d at 426 & n.3 (citing cases).

[5]   *Cusamano*, 604 F. Supp.2d at 426-27 & n.4 (citing cases).

[6]   Among other things, Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[7]   *Cusamano*, 604 F. Supp.2d at 427 & n.6 (citing cases).

Eighth Amendment, (2) Defendant MacDerment never fired his gun, and therefore a Fourth Amendment excessive force claim cannot exist against him, (3) based on the undisputed material facts, it was reasonable for Defendants Metz and Davis to use deadly force against Plaintiff, and therefore a Fourth Amendment excessive force claim cannot exist against them, and (4) they are all entitled to qualified immunity.

As an initial matter, City Defendants are correct that, because Plaintiff was not incarcerated at the time of the incident giving rise to his excessive force claim, the claim must be dismissed to the extent it is asserted under the Eighth Amendment.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (noting that claims of excessive force made in the course of a "seizure" are analyzed under the Fourth Amendment).

Moreover, based on the current record, the Court agrees with City Defendants' argument that Plaintiff's excessive force claim against Defendant MacDerment must be dismissed.  This is because there is no admissible evidence in the record from which a rational factfinder could conclude that Defendant MacDerment (1) fired his gun at any point during the incident giving rise to Plaintiff's excessive force claim, and/or (2) otherwise subjected Plaintiff to any level of force.

Furthermore, based on the current record, the Court accepts City Defendants' argument that, based upon the undisputed material facts, the use of force by Defendants Metz and Davis was reasonable, and therefore not excessive, under the circumstances.

To establish that the use of force by Defendants Metz and Davis was constitutionally excessive within the meaning of the Fourth Amendment, Plaintiff must show that their actions were "objectively unreasonable in light of the facts and circumstances confronting [them], without regard to [their] underlying intent or motivation."  *Maxwell v. City of New York*, 380

F.3d 106, 108 (2d Cir. 2004) (internal quotation marks omitted).[8]

With respect to deadly force in particular, "an officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (internal quotation omitted); *see also Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). "In all cases, the reasonableness of the officer's decision to use force in effectuating a seizure 'depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force.'" *Nimely*, 414 F.3d at 390-91 (quoting *Cowan*, 352 F.3d at 762).

Here, the evidence in the record clearly establishes as follows: (1) Plaintiff stole a black Lincoln Aviator from Americar; (2) he attempted to evade law enforcement officials in the vehicle; (3) in doing so, he hit Defendant MacDerment with the vehicle; (4) Defendant Davis shot out the rear tires of the vehicle; (5) Plaintiff exited the vehicle carrying a firearm; (6) he fired a shot at Defendant Davis; (7) while continuing to run from law enforcement officials, Plaintiff fired additional shots at them; (8) he did not comply with Defendant Metz's orders to stop running and drop his weapon; (9) Defendants Davis and Metz fired return shots at Plaintiff; (10) Plaintiff was shot in the hand, back, and the leg, and was ultimately taken into custody; and (11) he pled guilty to three counts of attempted aggravated murder for attempting to cause the

---

[8]     As noted by the Second Circuit in *Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005), "*Graham v. Connor*, 490 U.S. 386, 394-95 (1989), and its progeny hold that excessive force claims must be analyzed under the rubric of the constitutional right that is most directly implicated by the facts giving rise to the claim." *Nimely*, 414 F.3d at 390 n.7. "Because this case arises in the context of a police pursuit, it is governed by the Fourth Amendment 'reasonableness' standard." *Id.*

death of Defendants Davis, Metz and MacDerment.

Based on these undisputed material facts, Defendants Davis and Metz clearly had probable cause to believe, before shooting Plaintiff, that he posed a significant threat of death or serious physical injury to them or others.  As a result, it was objectively reasonable for Defendants Davis and Metz to use deadly force, as a matter of law.

Finally, because the Court has concluded that the conduct of Defendants Davis and Metz was "objectively reasonable," the Court need not address City Defendants' argument regarding qualified immunity.  However, even assuming that the use of force by Defendants Davis and Metz may somehow be viewed as existing on the "hazy border between excessive and acceptable force,"[9] it would not be clear to a reasonable officer in their situation that shooting Plaintiff was unlawful, based on the fact that these Defendants fired their weapons in response to Plaintiff firing at them (and after he previously hit Defendant MacDerment with his vehicle).  As a result, Plaintiff's excessive force claim against these Defendants is dismissed on the alternative ground of qualified immunity.  *See Saucier*, 533 U.S. at 201 (2001) (noting that the relevant inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"); *see also Loria v. Gorman*, 306 F.3d 1271, 1286 (2d Cir. 2002) ("Said differently, . . . we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions.").

For each of these alternative reasons, Plaintiff's excessive force claim against City Defendants is dismissed.

**B.     Plaintiff's State Law Claims of Assault and Battery Against City Defendants**

As stated above in Part I.C. of this Decision and Order, City Defendants seek the dismissal of Plaintiff's claims of assault and battery for two reasons: (1) Defendant MacDerment

---

[9]        *See Saucier v. Katz*, 533 U.S. 194, 206 (2001).

never fired his gun; and (2) Defendants Metz and Davis were justified in their use of deadly

force because the record establishes that Plaintiff was the aggressor.  Based on the current

record, the Court accepts City Defendants' arguments.

"To prove his state law civil battery claim . . . , [Plaintiff must] . . . to show that the

officer made 'bodily contact, that the contact was offensive, and that [the officer] intended to

make the contact.'"  *Nimely*, 414 F.3d at 391 (quoting *Laurie Marie M. v. Jeffrey T. M.*, 159

A.D.2d 52, 55 [N.Y. App. Div. 2d Dept 1990]).  "To establish an assault claim under New York

law, plaintiff must show that defendant [intentionally] placed the plaintiff in reasonable fear of

imminent harmful or offensive bodily contact."  *5 Borough Pawn, LLC v. Marti*, 753 F. Supp.2d

186, 200-01 (S.D.N.Y. 2010).  In addition, to succeed on his assault or battery claims, Plaintiff

must "prove that [the officer's] conduct was not reasonable within the meaning of [N.Y. Penal

Law § 35.30(1),] the New York statute concerning justification of law enforcement's use of force

in the course of their duties."  *5 Borough Pawn, LLC*, 753 F. Supp.2d at 200-01; *Torres-Cuesta*

*v. Berberich*, 08-CV-1382, 2011 WL 3298448, at *13 (E.D.N.Y. Aug. 1, 2011) (noting that the

justification defense applies to a claim of assault or battery); *see also Gomez v. City of New York*,

05-CV-2147, 2007 WL 5210469, at *11 (S.D.N.Y. May 28, 2007) ("Where an arrest is

supported by probable cause, an officer will not be liable under theories of assault and battery for

the 'use [of] physical force when and to the extent she or he reasonably believes [it is] necessary

to effect the arrest.'") (quoting *Lederman v. Adams*, 45 F. Supp.2d 259, 268 [S.D.N.Y. 1999]).

Pursuant to N.Y. Penal Law § 35.30(1), "[a] police officer . . . in the course of effecting

or attempting to effect an arrest, or of preventing or attempting to prevent the escape from

custody, of a person whom he . . . reasonably believes to have committed an offense, may use

physical force when and to the extent he . . . reasonably believes such to be necessary to effect

the arrest, or to prevent the escape from custody, or in self-defense or to defend a third person

from what he . . . reasonably believes to be the use or imminent use of physical force[.]"
Furthermore, a police officer may use "deadly physical force" when he "reasonably believes that
. . . [t]he offense committed or attempted by such person was a felony and that, in the course of
resisting arrest therefor or attempting to escape from custody, such person is armed with a
firearm or deadly weapon."  N.Y. Penal Law § 35.30(1)(b).  Similarly, a police officer may use
"deadly physical force" when he "reasonably believes that . . . the use of deadly physical force is
necessary to defend [himself] or another person from what the officer reasonably believes to be
the use or imminent use of deadly physical force."  N.Y. Penal Law § 35.30(1)(c).

As noted above in Part III.A. of this Decision and Order, there is no evidence in the
record from which a rational factfinder could conclude that Defendant MacDerment (1) fired his
gun at any point during the incident giving rise to Plaintiff's arrest, and/or (2) otherwise
subjected Plaintiff to any level of force.  Nor is there any admissible evidence from which a
rational factfinder could conclude that Defendant MacDerment drew his weapon on Plaintiff, or
otherwise intentionally placed Plaintiff in reasonable fear of imminent harmful or offensive
bodily contact.  Furthermore, based on the admissible evidence in the record, a rational
factfinder could only conclude that Defendant MacDerment had probable cause to attempt to
stop Plaintiff's vehicle using his vehicle, or take whatever other actions he may have taken in an
attempt to effectuate Plaintiff's arrest.  As a result, Plaintiff's assault and battery claims against
Defendant MacDerment are dismissed.

Moreover, as also noted above in Part III.A. of this Decision and Order, the admissible
evidence in the record undisputedly establishes that, before Defendants Metz and Davis shot
Plaintiff, Plaintiff had (1) committed a felony, (2) attempted to evade law enforcement officials
while carrying a firearm, and (3) fired the firearm at Defendant Davis as well as others.  Based
on these undisputed material facts, the defense of justification protects Defendants Metz and

Davis from liability (on Plaintiff's claims of assault and battery) pursuant to N.Y. Penal Law §
35.30(1)(b).  Moreover, based on these undisputed material facts, Defendants Metz and Davis
could, and did, reasonably believe that the use of deadly physical force was necessary to defend
themselves or another person from Plaintiff's use or imminent use of deadly physical force, such
that the defense of justification protects them from liability (on Plaintiff's claims of assault and
battery) pursuant to N.Y. Penal Law § 35.30(1)(c).

For these reasons, Plaintiff's state law civil battery and assault claims against Defendants
Metz and Davis are dismissed.

### C.    Plaintiff's Medical Indifference Claim Against County Defendant

As stated above in Part I.C. of this Decision and Order, County Defendant seeks the
dismissal of Plaintiff's medical indifference claim because Plaintiff has failed to adduce
admissible record evidence from which a rational factfinder could conclude that (1) County
Defendant was personally involved in the alleged violation of his constitutional rights, (2) the
alleged violation of his constitutional rights resulted from a custom or policy, or (3) any of the
Justice Center staff under the supervision of County Defendant were deliberately indifferent to
Plaintiff's serious medical needs.  Based on the current record, the Court accepts County
Defendant's third argument.

"Where a pre-trial detainee alleges deliberate indifference to a medical need while
incarcerated, such a claim is evaluated under the Due Process Clause of the Fourteenth
Amendment."  *Dzwonczyk v. Syracuse City Police Dept.*, 08-CV-0557, 2008 WL 5459147, at
*13 (N.D.N.Y. Dec. 22, 2008) (McCurn, J.) (citing *Arac v. Bodek*, 213 F.3d 625 [2d Cir. 2000])
(other citation omitted).  "While the exact standard to be applied to such a claim has not been
made clear, what is known is that the pre-trial detainee's rights are at least as great as those
provided to a convicted prisoner under the Eighth Amendment, and that something more than

negligence on the part of the defendant is required." *Dzwonczyk*, 2008 WL 5459147, at *13 (citations omitted). "Consequently, courts tend to apply the Eighth Amendment standard when deciding a pre-trial detainee's claim for deliberate indifference to a medical need under the Fourteenth Amendment." *Id.* (collecting cases).

As a result, to establish a claim for deliberate indifference to a serious medical need, a pre-trial detainee plaintiff must allege as follows: "(1) a deprivation that is sufficiently serious, i.e., a deprivation that presents a condition of urgency, one that may produce death, degeneration, or extreme pain, and (2) reckless [or intentional ] indifference, that is, defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm." *Id.* (internal quotation marks and citations omitted).

### 1.     Whether Plaintiff's Injuries Constituted Serious Medical Need

"A serious medical condition must be 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Osacio v. Greene*, 08-CV-0018, 2009 WL 3698382, at *4 (N.D.N.Y. Nov. 2, 2009) (McAvoy, J.) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 [2d Cir. 1994]). "Factors that have been considered in determining whether a condition is serious include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Osacio*, 2009 WL 3698382, at *4 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 [2d Cir. 1998]) (other citations omitted). The "factors listed above, while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance*, 143 F.3d at 702.

19

Plaintiff has introduced evidence that he suffered the following injuries as a result of being shot on February 12, 2007: (1) a "superficial" bullet wound in the upper right quadrant of his back;[10] (2) "a soft tissue defect or small focus of air along the lateral subcutaneous tissues midway down the leg"; (3) a "badly comminuted fracture" on "the base of the phalanx, left small finger"; and (4) "gross contamination in the wound [on his finger]."  (Dkt. No. 49, Attach. 1, at 3, 7-8, 13-16.)

The Court assumes, for the sake of argument, that a rational factfinder could conclude from such evidence that Plaintiff's injuries were sufficiently serious to constitute a serious medical condition.  However, the Court makes this assumption with some hesitation.[11]

### 2.    Whether Defendants Were Deliberately Indifferent to Plaintiff's Medical Needs

"The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded 'an excessive risk to inmate health or safety.'"  *Ford*

---

[10]    While it is not entirely clear, it appears that the bullet causing this wound did not embed itself in Plaintiff's body but created only an "abrasion."  In particular, the Court notes that Plaintiff's sealed medical records, provided by County Defendant, establish that Plaintiff suffered a "superficial 3 x 1 cm abrasion on the posterior right scapula."  (Dkt. No. 44 at 76.)

[11]    *See Davidson v. Harris*, 960 F. Supp. 644, 648 (W.D.N.Y. 1997) (finding that plaintiff failed to demonstrate that multiple stab wounds to the chest, head and back constituted a serious medical condition, noting that, although "there was some concern that plaintiff had a slight pneumothorax (collapsed lung), plaintiff's condition was never classified as grave or life-threatening"); *Rivera v. S.B. Johnson*, 95-CV-0845, 1996 WL 549336 (W.D.N.Y. Sept.20, 1996) ("A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection."); *Henderson v. Doe*, 98-CV-5011, 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (holding that injury to a finger is not "sufficiently serious" because it does not produce death, degeneration or extreme pain); *Bonner v. New York City Police Dept.*, 99-CV-3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (finding no serious medical need where plaintiff was unable to close one of his fingers and had discomfort due to allegedly inadequate treatment of his injured hand); *Grant v. Burroughs*, 96-CV-2753, 2000 WL 1277592, at *4 (S.D.N.Y. Sept. 8, 2000) (finding that, even assuming plaintiff was in pain for two months, plaintiff's pain was not so severe as to constitute a serious medical condition); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 303, 311 (S.D.N.Y. 2001) (finding that cut finger with "skin ripped off" was insufficiently serious to merit constitutional relief).

*v. Phillips*, 05-CV-6646, 2007 WL 946703, at *12 (S.D.N.Y. Mar. 27, 2007) (quoting *Hathaway*

*v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 [1995] ["The official

must both be aware of the facts from which the inference could be drawn that a substantial risk

of serious harm exists, and must also draw the inference."]).  "Specifically, the plaintiff must

prove that the accused defendant acted, or declined to act, with a state of mind equivalent to

criminal recklessness."  *Ford*, 2007 WL 946703, at *12 (collecting cases).

Plaintiff has introduced evidence that, on February 12, 2007, he was (1) arrested at 3:30

p.m.,[12] (2) taken to the emergency room in an ambulance, where he arrived at 4:05 p.m.,[13] (3)

examined, and had x-rays taken of his hand and leg, and (4) diagnosed with a "badly

comminuted fracture" of a bone in his hand, which was splinted.

Plaintiff has also introduced evidence that, on February 28, 2007, he was seen again by

Dr. Klena, who performed two additional x-rays of Plaintiff's hand, and discussed with Plaintiff

the need for operative intervention.  (Dkt. No. 49, Attach. 1, at 16.)  During this discussion, Dr.

Klena "reinforced" to Plaintiff that there was "nothing [medical staff] could do to give him a

normal MP joint of the small finger but [they] would direct [their] efforts toward trying to keep

him from having a fusion."  (*Id.*)  Dr. Klena also "discussed the possibility that [Plaintiff] may

require tendon and nerve repairs at the same time."  (*Id.*)

Plaintiff has also introduced evidence that surgery was performed on his finger on March

1, 2007, during which time (1) "several free fragments [of bone] were removed," (2) his wounds

were "irrigated with copious quantities of sterile saline," (3) "[a] foreign body was seen and

removed[,]" (4) "[a] minimal amount of the proximal phalanx was removed in order to preserve

as much bone stock as possible[,]" (5) "[a]n EBI mini external fixator, articulated, was placed

---

[12]      (Dkt. No. 1; Dkt. No. 49, Attach. 1, at 11.)

[13]      (Dkt. No. 49, Attach. 1, at 6.)

through a proximal and distal 1.6 threaded wires[,]" and (6) his wounds were closed with sutures, and his finger was placed in a splint.  (Dkt. No. 49, Attach. 1, at 13-14.)

Finally, Plaintiff has introduced evidence that, on March 14, 2007, he was seen again by Dr. Klena, during which time Dr. Klena (1) examined Plaintiff's physical condition, (2) removed his sutures, (3) advised him that the medical staff is "not entirely optimistic about how much range of motion he is going to get[,] and that he still may require further surgeries to try to maximize his motion[,]" and (4) scheduled him for a two-week follow up appointment.  (*Id.* at 15.)

In addition, County Defendant has adduced the following record evidence regarding additional treatment that Plaintiff received during the time he was detained at the Justice Center, which Plaintiff has not refuted: (1) after he was discharged from the hospital and booked at the Justice Center on February 13, 2007, he was seen by a nurse, who took his vitals, and gave him Tylenol and Motrin for pain; (2) on February 14, 2007, Plaintiff was examined by Dr. James Greenwald at the Justice Center, during which time Plaintiff's vitals were taken, his shoulder and leg wounds were examined and cleaned, and he was scheduled for a follow up appointment at the orthopedic hand clinic in two weeks; (3) while awaiting his follow up appointments at the hand clinic and trauma clinic, Plaintiff's wounds were cleaned and dressed, and he received pain medication; (4) after returning to the Justice Center following his surgery, Plaintiff requested a sling for his arm, which he was given on March 2, 2007; (5) a physician at the Justice Center directed the nursing staff to ensure that there was no vascular compromise resulting from the use of the sling; (6) on March 8, 2007, before being taken to University Hospital for a follow up appointment, Plaintiff was seen briefly by Dr. Yambo at the Justice Center; (7) at Plaintiff's follow up appointment, his wounds were examined and cleaned; (8) after his hand appointment with Dr. Klena on March 14, 2007, Plaintiff returned to the Justice Center, where he continued to

receive wound care and medication to address his medical and physical needs; (9) on March 18, 2007, after Plaintiff complained to nursing staff that he inadvertently jarred the external fixator to his hand, causing him extreme pain, swelling and some bleeding, his hand was examined by a nurse, who noted that the bleeding had stopped, and scheduled Plaintiff for a "priority 1" sick call visit with the physician the following day; (10) on March 19, 2007, Dr. Greenwald examined Plaintiff, and directed that a follow up appointment at the hand clinic be scheduled for one week later; (11) on March 22, 2007, Plaintiff was seen and evaluated at the University Hospital Trauma Clinic, during which time staff noted that, as a result of his improved condition, no further follow up appointment at the trauma clinic was necessary; (12) on March 28, 2007, Plaintiff was seen again at the University Hospital Orthopedic Hand Clinic for a follow up appointment with Dr. Weiss, during which time Plaintiff was fitted by Occupational Therapy with a volar forearm-based splint and his fourth and fifth digits were buddy taped; (13) on April 10, 2007, Plaintiff was evaluated by a physical therapist; (14) on April 17, 2007, Plaintiff attended a second session of physical therapy; (15) on April 18, 2007, Plaintiff attended his follow up appointment at the hand clinic, during which time staff noted that Plaintiff was doing "o.k.," but would probably require more surgery, and recommended that he continue to buddy tape his right and little finger; (16) on April 24, 2007, and May 8, 2007, Plaintiff attended more physical therapy; (17) on May 9, 2007, Dr. Mosher examined Plaintiff's finger at the hand clinic, and decided that he would schedule Plaintiff for tenolysis and arthrolysis; and (18) on May 23, 2007, Plaintiff attended a preoperative appointment at University Hospital, where pre-testing was performed and Plaintiff was scheduled to undergo surgery on May 31, 2007.

Finally, Plaintiff has failed to adduce any admissible record evidence from which a rational factfinder could conclude that he requested, but was denied, treatment or medication on any occasion while he was detained at the Justice Center. In fact, there is no admissible

evidence from which a rational factfinder could conclude that Plaintiff experienced even one delay in treatment during this time.

Under these circumstances, the Court concludes that, even assuming that Plaintiff's injuries constituted a serious medical need, Plaintiff has failed to introduce sufficient admissible evidence from which a rational factfinder could conclude that any member of the medical staff supervised by County Defendant was deliberately indifferent to Plaintiff's serious medical needs. *See Davidson v. Harris*, 960 F. Supp. 644, 648 (W.D.N.Y. 1997) ("As any lay person is well accustomed, patients are frequently faced with delays in receiving medical care, particularly when, [as in this case], their medical condition is not grave.").[14]  Indeed, based on the current record, a rational factfinder would experience difficulty in finding even any negligence by County Defendant's subordinates.

In the alternative, the Court accepts County Defendant's other two arguments, for the reasons stated by him in his memorandum of law.

For each of these alternative reasons, Plaintiff's deliberate indifference to serious medical needs claim against County Defendant is dismissed.

---

[14]     *See also Hernandez v. Keane*, 341 F.3d 137, 145-46 (2d Cir. 2003) (concluding that treating prison physician and physician's assistant were not deliberately indifferent to prisoner's serious medical needs involving hand injury from gunshot because, although hand surgery and other treatment were delayed, a medical hold to prevent his transfer to another facility while surgery was being contemplated was not issued, and some post-surgery treatment was denied, most of the delay before surgery was caused by factors beyond physician's and assistant's control, some delay was caused by prisoner's other medical conditions, surgery was risky procedure, determination of medical hold was nurses' responsibility, prisoner refused some recommended post-surgical treatment, and prisoner received physical therapy); *Sharp v. Jeanty*, 93-CV-0220, 1993 WL 498095 at *2 (S.D.N.Y. Nov. 30, 1993) (finding that plaintiff's complaints of pain in his knee, that ultimately culminated in surgery, that were repeatedly ignored by defendant, even if true, would not by itself reach the Eighth Amendment standard); *Reyes v. Turner*, 93-CV-8951, 1996 WL 93728, at *9 (S.D.N.Y. Mar. 5, 1996) ("Plaintiff's preference for an examination by a physician does not sustain a claim for denial of medical assistance. 'There is no right to the medical treatment of one's choice if the prescribed treatment is based upon applicable medical standards.'") (quoting *McCloud v. Delaney*, 677 F. Supp. 230, 232 [S.D.N.Y. 1988]).

**ACCORDINGLY,** it is

**ORDERED** that City Defendants' motion for summary judgment (Dkt. No. 36) is

**<u>GRANTED</u>**; and it is further

**ORDERED** that County Defendant's motion for summary judgment (Dkt. No. 39) is

**<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **<u>DISMISSED</u>** in its entirety with

prejudice.  The clerk is directed to enter judgment in favor of the defendants and close this case.

Dated: September 15, 2011
       Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge